UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 04/17/2019
```

Oman Gutierrez,

                              Petitioner,

              -against-

Christopher Miller,

                              Respondent.

1:17-cv-09570 (PGG) (SDA)

**REPORT AND RECOMMENDATION**

STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE.

TO THE HONORABLE PAUL G. GARDEPHE, UNITED STATES DISTRICT JUDGE:

Petitioner Oman Gutierrez ("Gutierrez" or "Petitioner"), a New York prisoner currently incarcerated at Great Meadow Correctional Facility, seeks a writ of habeas corpus, as authorized by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254. Following a jury trial, Gutierrez was convicted on December 14, 2010 in the Supreme Court of the State of New York, New York County, of murder in the first degree, murder in the second degree, conspiracy in the second degree, criminal possession of a weapon in the second degree and criminal possession of a weapon in the third degree. (Pet., ECF No. 2, ¶¶ 1, 5.) He thereafter was sentenced to an aggregate prison term of 52 1/2 years to life. (*Id.* ¶ 3.)

Gutierrez brought this action in December 2017 to challenge his conviction on several grounds. (Pet. ¶ 12.) In February 2018, Gutierrez sought a stay of this action so that he could pursue in state court two unexhausted claims: (1) that his Sixth Amendment right to a public trial was violated when the trial court ejected his family members from the courtroom; and (2) that his trial counsel denied him the right to be present at material stages of his case. (2/20/18 Letter, ECF No. 12, at 2-5.) The State filed its opposition to the motion to stay on March 5, 2018.

(Marinelli Aff., ECF No. 14.) By Opinion and Order dated March 16, 2018, I denied Gutierrez's request for a stay without prejudice, holding that before I can address his stay application, Gutierrez must first move to amend his current Petition pursuant to Federal Rule of Civil Procedure 15(a) to seek to add the new, unexhausted claims. (*See* Op. & Order, ECF No. 15, at 4.)

Gutierrez made a request to amend by letter dated May 9, 2018. (5/9/18 Letter, ECF No. 16.) The State filed its opposition to the motion to amend on May 24, 2018. (Aff. in Opp., ECF No. 17.) The State filed its response to the Petition on May 30, 2018. (Response, ECF No. 18.)

For the reasons stated below, I recommend that the motions to amend and to stay be DENIED, and that the Petition be DENIED in its entirety.

## BACKGROUND

I.   **Factual Background**

A.   **Facts Arising Prior To Trial**

Gutierrez was the head of a family-run organization that sold cocaine and marijuana near West 204th Street and Post Avenue in Manhattan. In 2000, Gutierrez was arrested, convicted and sentenced to a six-year prison term. In Gutierrez's absence, Edward Contreras took over marijuana distribution at the corner of West 204th Street and Post Avenue. In 2004, as Gutierrez's release from prison approached, he allegedly conspired with his lifelong friend, Jose Inoa, among others, to murder Contreras and take control of the area. On January 11, 2005, Inoa shot and killed Contreras. *See Inoa v. Smith*, No. 16-CV-02708 (VEC) (JLC), 2018 WL 4110908, at *3 (S.D.N.Y. Aug. 29, 2018) *adopted*, 2019 WL 549019 (Feb. 9, 2019).[1]

---

[1] Inoa, like Gutierrez, filed in this Court a petition for a writ of habeas corpus. On August 29, 2018, Magistrate Judge Cott issued a Report and Recommendation ("R&R") recommending that Inoa's petition

In March 2009, a grand jury charged Gutierrez with murder in the first degree, murder in the second degree, attempted murder in the second degree, conspiracy in the second degree, assault in the first degree, criminal possession of a weapon in the second degree and criminal possession of a weapon in the third degree.[2] A joint trial of Gutierrez and Inoa was held in New York State Supreme Court, before Justice Gregory Caro, which began on June 1, 2010. *Id.*

**B.   Evidence At Trial And Incorporation Of Background Section Of Jose Inoa Report And Recommendation**

Judge Cott's R&R, which was adopted by District Judge Caproni, contains a meticulous, detailed discussion of the evidence presented during the joint trial. *Id.* at **4-19. The Background Section of Judge Cott's R&R is hereby incorporated by reference, and relevant portions of the R&R are included below (citations and footnotes omitted):

**The Prosecution's Case**
The prosecution offered testimony from 18 witnesses, two of whom played a particularly significant role at the trial. One of these key witnesses was Rolando Rivera, a detective with the New York City Police Department. Prior to trial, the prosecution asked Rivera to review tape recordings of 77 telephone calls, placed between December 2004 and May 2005, that Gutierrez had made while he was incarcerated. The majority of these calls were in Spanish. Rivera, a native Spanish speaker, translated the calls into English and prepared written word-for-word transcripts of portions of the 77 phone calls that he and the prosecution considered pertinent to the case. In addition, Rivera prepared written summaries of some of the other calls. The tape recordings of Gutierrez's 77 phone calls from prison, as well as Rivera's transcripts of portions of those calls, were entered into evidence at trial.

Notably, by the time of trial, Rivera had already become familiar with Gutierrez's criminal organization. In 1999, while assigned to a narcotics unit, Rivera participated in a criminal investigation of the Gutierrez family. As part of that investigation, Rivera listened to "hundreds of hours" of wiretapped phone calls

_____

be denied, which was later adopted by the District Judge. A copy of Judge Cott's R&R is being mailed to the pro se Petitioner, along with this R&R.

[2] Inoa, along with several others, also were charged with crimes.

involving Gutierrez and his associates. Rivera also learned during the 1999 investigation that Gutierrez and his associates spoke in "coded" language about their illegal activities. Rivera became familiar with this coded language by preparing hundreds of transcripts from wiretaps. He was also able to identify coded language used by the callers in the 77 recorded phone calls Gutierrez had made from prison. Consequently, Rivera was "deemed an expert in decoding phone conversations" at trial by Justice Carro.

The prosecution's second key witness was [Eldia] Duran, who was Gutierrez's ex-girlfriend. She professed to having firsthand knowledge of the plan to kill Contreras, in large part by participating in and listening to three-way phone calls during which Gutierrez and others discussed the plan. Duran testified extensively at trial about many of the plan's details, including Inoa's designation as the person who would shoot and kill Contreras.

The prosecution's other witnesses were Joaris Grullon, one of the co-conspirators in the plan to kill Contreras; Enrique Zorrilla and Jose Antonetti, who drove Contreras to the hospital after he was shot; Michael Santiago, Joan Lopez, and Kenneth Ortiz, three drug dealers who had formerly worked for Gutierrez; Israel Rolon, a police officer who collected the physical evidence at the crime scene of Contreras's shooting; Peter Tostaine III, the paramedic who transported Santos to the hospital; Dr. David Greenman, who testified about the injuries sustained by Santos as a result of the shooting; Dr. Kara Storck, the medical examiner who testified about Contreras's autopsy report; Detective Anthony Ricevuto, who investigated drug activity at West 204th Street and Post Avenue between 1999 and 2005; Detective Kevin Arias, who interviewed Inoa after he was hospitalized for a gunshot wound in 2005 in an unrelated incident; Sergeant Khamraj Singh, a police officer who testified about an incident involving Gutierrez and Inoa in 1997; Rosa Ramirez, the mother of two of Contreras's children; Rovan Milliard, supervising counsel to the New York State Department of Corrections; and Paul Dauo, who worked at the New York County District Attorney's Office and reviewed Gutierrez's telephone records.

The witnesses' pertinent trial testimony is summarized below.

**Gutierrez's Criminal Organization**

Rivera testified that in 1999, while working for a New York City Police Department narcotics unit, he investigated narcotics sales in the area of West 204th Street and Post Avenue. Rivera testified that Gutierrez, along with his brother Eliesel and cousin Randy, dealt drugs in the area. Gutierrez was the "boss" of the operation. Rivera testified further that, as a result of the investigation, Gutierrez, Randy, and ten others were indicted and eventually arrested by the authorities. Gutierrez was convicted and sentenced to a six-year prison term.

Santiago, one of Gutierrez's former drug dealers, testified that "there was nobody in the neighborhood" after "all the Gutierrez' was [sic] locked up," and that Contreras started working with [an individual named] Torres to sell drugs in the area formerly occupied by Gutierrez. Enrique Zorrilla, Contreras's cousin who worked as his "chauffeur," testified that Contreras controlled certain "corners" in partnership with Torres. Similarly, Lopez, Ortiz, and Rivera testified that Contreras led a drug-selling organization in the area of West 204th Street and Post Avenue in partnership with Torres.

**Duran Develops Relationship With Gutierrez And Meets Inoa**
Duran testified that in December 2003, Gutierrez's sister, Miosoty, introduced Duran to Gutierrez over the phone. Gutierrez was imprisoned at the time. Duran and Gutierrez began "flirting" over the phone. In January 2004, Duran visited Gutierrez in prison.

As Duran's relationship with Gutierrez developed, she began to meet his family members and friends, including his brothers Joel and Eliesel, his cousins Randy Gutierrez and Derlis Frometa, and family friend Anthony Lugo. Duran met Inoa around "the end of 2004," and thereafter communicated with him by phone and in person. Duran testified at trial that Inoa was "Oman's boy" and that Gutierrez and Inoa "were friends since childhood" and "best buddies[.]"

Duran also testified that Gutierrez, as well as members of his family and other people, referred to Inoa by various nicknames, including "Andy." Rivera testified that "Andy" is Inoa's middle name (based on a driver's license obtained when Inoa was hospitalized in 2005).

**Gutierrez's Communications From Prison**
Duran testified that while Gutierrez was incarcerated, he could only call certain landline house phones from prison. Initially, in order to speak with Duran directly, Gutierrez needed to call his sister, Miosoty, who would connect the call to Duran's cellphone. Eventually, Duran had her own landline installed and received calls from Gutierrez directly.

After Duran began receiving direct calls, Gutierrez asked Duran to connect him to his brothers, his cousin Randy, and others, including Inoa. Because she connected the calls, Duran would listen to Gutierrez's conversations, which were often about operating Gutierrez's drug business. Gutierrez would require Duran to stay on the line in case Gutierrez needed to be transferred to another person. In these three-way calls, Duran also spoke on the phone with Inoa.

**The Plan To Kill Contreras**
Duran testified that in April 2004, she and Gutierrez began discussing how it would be necessary to kill Contreras in order for Gutierrez to retake control over the drug

trade at West 204th Street and Post Avenue. She testified that she overheard Gutierrez say he was going to be in charge after killing Contreras. Gutierrez had previously expressed frustration with Contreras "taking [Gutierrez's] spot" and stated that he "need[ed] to get rid of [Contreras]." Duran testified that "getting rid" of Contreras meant "killing him."

Duran also testified that one evening in January 2005, Gutierrez (who was out of prison at the time as part of a "work release" program), his cousins Randy and Frometa, and Frometa's girlfriend, Joaris Grullon, came to Duran's home in Queens and discussed the plan to kill Contreras and retake control of the drug trade. Duran testified that Grullon "volunteered to be the driver" the day that they would search for, and kill, Contreras.

**Inoa's Designation As The Shooter And The $10,000 Payment By Gutierrez**
On December 26, 2004, Duran spoke on the phone with Gutierrez, who asked to be connected to Eliesel. Duran testified that she then overheard a conversation in which Gutierrez and Eliesel agreed that Inoa would be the one to kill Contreras, after which Inoa would return to Georgia, where he lived. Gutierrez and others discussed in other conversations that Inoa would be the shooter. Duran testified that Inoa "owed Oman favors because they used to cover each other up. They used to do things together since childhood." She also testified that Gutierrez made the "final decision" that Inoa would kill Contreras. According to both Duran and Rivera, Inoa himself acknowledged that he would be the one to kill Contreras.

Duran testified that Gutierrez planned on giving Inoa $10,000 to kill Contreras. The money was supposed to be paid out of $20,000 that Torres planned to give to Gutierrez upon his release from prison.

**The Night Of The Shooting**
Grullon testified to "driving around" with Inoa, Randy, and Frometa on the night of January 10, 2005. Grullon understood that she was driving around with the purpose of finding a person named "Ed" or "Edward." She also testified that, at some point, she double parked on Vermilya Avenue, Randy exited the car and walked north to 207th street, and Inoa walked south toward 204th Street. About ten minutes later, Randy and Inoa returned to the car and Grullon dropped Inoa off at 218th Street.

Zorrilla, Contreras's cousin and driver, testified that on the night of January 10, he walked with Contreras and Santos toward a grocery store named Licey's on 204th Street and Sherman Avenue. Zorrilla walked to one of Contreras's cars parked nearby while Contreras and Santos walked toward the grocery store. Zorrilla then saw Inoa "leaning on the wall" of a nearby building. Inoa, who was wearing "all black" and "smoking a cigarette," started jogging toward Licey's and "pulled the gun out." Zorrilla saw him from about 20 feet away. Zorrilla then heard gunshots

from inside Licey's. Inoa then ran out of the supermarket and Zorrilla was able to see him again "face to face." Zorilla testified that Inoa had been in the store for "less than 20 seconds."

Kenneth Ortiz testified that he was walking near Vermilyea Avenue and 204th Street on the night of January 10. He "heard a gunshot" and then saw Inoa "running down the block" with a gun. Ortiz testified that Inoa then got into a car, which Grullon testified was her car.

Jose Antonetti, a friend of Contreras's who was walking in the area, testified that he heard the gunshots and saw Zorrilla "running up the block." Both Antonetti and Zorrilla saw Contreras walk out of Licey's. Antonetti observed that Contreras had a "hole" in his neck. Contreras told Antonetti and Zorrilla to take him to a hospital. Antonetti and Zorrilla testified that they got into a car and took Contreras to the hospital. On the way to the hospital, Antonetti asked Contrereas, "Who did this to you?" to which Contreras responded, "Andy."

Dr. Kara Storck, the city medical examiner who reviewed Contreras's autopsy report at trial, testified that Contreras was pronounced dead at 4:00 a.m. on January 11, 2005. She testified further that Contreras died of a gunshot wound to his torso. He had also sustained a gunshot wound to his head.

Paramedic Peter Tostaine testified that, shortly after 12:45 a.m. on January 11, 2005, he and his partner arrived in an ambulance to the scene of the shooting. Tostaine found Santos "bleeding from the top of his head and his face and an apparent bullet hole," and took him to an adult trauma center at a hospital in Harlem. Dr. David Greenman, who treated Santos after the shooting, testified that Santos suffered permanent physical damage.

Duran testified that later on the night of the shooting, Joel—one of Gutierrez's brothers—came to her house and exclaimed, "We did it. We finally did it!"

**Gutierrez Retakes Control Of The Drug Trade And Discusses Inoa's $10,000 Payment**
Detective Anthony Ricevuto testified that, after January 2005, he worked undercover and purchased drugs on multiple occasions from Eliesel Gutierrez, who appeared to be leading drug sales in the area. Lopez and Ortiz likewise testified that, following Contreras's death, the Gutierrezes retook control of the drug trade at West 204th Street and Post Avenue.

Rivera testified that, based on the transcripts of the recorded telephone calls, in February 2005 Gutierrez again spoke with Duran about the $20,000 "investment" he expected to receive from Torres upon Gutierrez's release from prison. Duran testified that on February 2, 2005, she spoke on the phone with Gutierrez and

informed him that she had had a conversation with Inoa. Duran reported that Inoa planned to confront Torres about getting Inoa's share of the $20,000. In response, Gutierrez instructed Duran to tell Inoa to stay away for 60 days to allow the situation to "get[ ] cold."

Through Rivera, the prosecution introduced a transcript of a call that took place on May 20, 2005, during which Gutierrez spoke from prison with Lugo (his family friend) and instructed Lugo to tell Inoa "to take it easy," and that Gutierrez was "going to send [Inoa] half of what [Gutierrez] get[s]." That same day, Gutierrez also spoke with his brother Eliesel and told him to give Inoa "half" of the "ten pairs of s[n]eakers" so Inoa "can go down to Atlanta and chill." Rivera testified that the "ten pairs of sneakers" referred to $10,000, or half of the $20,000 Gutierrez expected to receive from Torres.

Based on a transcript of another recorded call, Gutierrez had a three-way conversation with Lugo and Inoa on May 21, 2005. Gutierrez told Inoa that he would be receiving money that week, that Inoa would get "five" from Gutierrez's brother, and that Inoa would receive the rest of the money once Gutierrez gets "the other ten." Rivera testified that Gutierrez was, in effect, telling Inoa that he would initially receive $5,000, and that he would be paid the remainder of the $10,000 at a later date.

**Duran And Grullon Become Cooperating Witnesses**

Duran testified that shortly after Gutierrez's work release, she learned that he had been unfaithful to her, and as a result Duran began to reevaluate their relationship. She testified that beginning on or about February 27, 2005, she stopped picking up phone calls from Gutierrez, claiming that she "didn't want to deal with him anymore." Duran "moved on" from Gutierrez, although he continued to try to win her back. Around mid-2005, Duran moved to the Dominican Republic.

In the fall of 2008, Duran's son was arrested in the United States on drug charges. Subsequently, Duran contacted Rivera about Contreras's killing, and she returned to the United States to meet with Rivera. Duran told Rivera what she knew about the killing of Contreras, including her own participation. Duran's hope was that, by providing information to the authorities about Contreras's killing, she would be able to help her son with the charges brought against him.

In exchange for her full cooperation in the case against Gutierrez and Inoa, Duran and the prosecution entered into a cooperation agreement pursuant to which her charges were reduced to a misdemeanor. The prosecution also helped Duran in getting the charges against her son dismissed.

> Additionally, like Duran, Grullon entered into a cooperation agreement in exchange for her full cooperation in the case against Gutierrez and Inoa.

*Inoa v. Smith*, 2018 WL 4110908, at *4-8 (citations and footnotes omitted). Gutierrez did not offer any evidence at the conclusion of the prosecution's case. *Id.* at n.6.

## II.    <u>Conviction And Sentencing</u>

Gutierrez was convicted by the jury of murder in the first degree, murder in the second degree, conspiracy in the second degree, criminal possession of a weapon in the second degree and criminal possession of a weapon in the third degree. (Pet., ¶¶ 1-5.) He was sentenced on December 14, 2010 to a prison term of 52 1/2 years to life. (Sentencing Tr., ECF No. 44, at 113.)

## III.    <u>Direct Appeal</u>

On direct appeal to the Appellate Division, First Department, Gutierrez raised five points of error: (1) improper admission of testimony concerning prior bad acts; (2) improper admission of testimony from Duran about audio recordings; (3) improper admission of evidence of multiple conspiracies other than the one charged and prosecuted; (4) improper admission of expert testimony by Detective Rivera; and (5) that the jury's conviction was against the weight of the evidence. (Direct Appeal Brief for Def.-Appellant, Response Ex. A, ECF No. 18-1.)

The First Department affirmed Gutierrez's conviction on July 14, 2015. (Order on Direct Appeal, Response Ex. C, ECF No. 18-1.) The First Department held that the "court properly received evidence that the conspiracy to commit murder was intended to eliminate a rival drug dealer, Contreras, and thus to regain control of drug trafficking in a particular area," and that there "was no variance between the murder conspiracy charged in the indictment and the one proved at trial." (*Id.* at 23.) Further, the First Department noted that the New York Court of

Appeals in an appeal from Inoa's conviction[3] had determined that "considerable portions" of Detective Rivera's testimony as "an expert in decoding phone conversations were admitted in error" (*id*. at 23-24), but had determined in Inoa's appeal that the error was harmless. Similarly to Inoa's appeal, the First Department found in Gutierrez's appeal that this error was harmless in view of the "overwhelming" proof of Gutierrez's "commission of the charged crimes." (*Id*. at 24; *see also Inoa*, 25 N.Y.3d. at 476.) Again citing the Court of Appeals' decision in *Inoa*, the First Department additionally found that Duran's testimony was "powerfully confirmed" by the record evidence, namely "the manifest content of the taped conversations." (Order on Direct Appeal at 25.)  The First Department found Gutierrez's other arguments "unavailing." (*Id*. at 26.)

Gutierrez petitioned the New York Court of Appeals for leave to appeal. (Pet.'s Appl. Seeking Leave, Response Ex. G, ECF No. 18-1.) In his application, he stated he was seeking leave to appeal "so I can exhaust all available state remedies on my appeal issues." (*Id*. at 2.[4]) He further stated that he "seeks leave to appeal from every part of the July 14, 2015 decision of the Appellate Court[.]" (*Id.* at 5.) In addition, he raised the following (new) issues: 1) whether the First Department erred by using the law of the case doctrine "in deciding a separate case" (*i.e.*, Inoa's case); 2) whether the First Department's decision "was erroneous in not reversing judgment that was tainted by improper variance of theory in indictment charging single act of conspiracy that DA expanded at trial to multiple conspiracy;" 3) an allegedly erroneous jury

---

[3] *People v. Inoa*, 25 N.Y.3d 466 (2015) (affirming Order from First Department upholding Inoa's conviction).

[4] There are three pages labelled page "2" in Petitioner's leave application. Here, I refer to the page which is stamped as "page 200" in the ECF heading affixed to the copy filed on the docket in this matter.

charge regarding intent; and 4) the dismissal of a juror. (*Id.* at 3-4.[5])  On January 7, 2016, the

Court of Appeals denied leave to appeal. (Order Denying Leave, Response Ex. I, ECF No. 18-1.)

**IV.**     ***Coram Nobis* Petition**

In July 2016, Petitioner submitted to the First Department a petition for writ of error

*coram nobis*, claiming ineffective assistance of appellate counsel. (Notice of Mot., Response Ex.

J, ECF No. 18-2.) The petition was denied on October 25, 2016. (Order, Response Ex. M, ECF No.

18-2; Pet., ¶ 11.) Gutierrez sought leave to appeal to the Court of Appeals. (Pet.'s Appl. Seeking

Leave, Response Ex. N, ECF No. 18-2.) The Court of Appeals denied Petitioner's application for

leave to appeal on March 29, 2017. (Order Denying Leave, Response Ex. P; ECF No. 18-2.)

**V.**     **Habeas Petition**

On December 5, 2017, Gutierrez filed his Petition for a writ of habeas corpus in this Court.

Gutierrez argues that the trial court deprived him of his Constitutional rights when it: (1) admitted

testimony regarding an unrelated crime committed fifteen years earlier; (2) admitted testimony

from Duran, a nonexpert witness, regarding her interpretation of Gutierrez's recorded

conversations; (3) permitted testimony regarding multiple conspiracies that were not part of the

charged offense; and (4) permitted Detective Rivera to testify as a quasi-expert on narcotics

trafficking, which was not part of the charged offense. (Pet., ¶ 12.) He also asserts that he was

denied his right to effective assistance of counsel on appeal. (*Id.*) After he filed his Petition,

Gutierrez subsequently identified two admittedly unexhausted grounds for relief he seeks to

pursue: (1) that his Sixth Amendment right to a public trial was violated when the trial court

---

[5] These pages refer to the pages which are stamped as pages 197-98 in the ECF heading affixed to the copy of this document filed on ECF.

ejected his family members from the courtroom; and (2) that his trial counsel denied him the right to be present at material stages of his case. (2/20/18 Letter at 2-5.) Each of these seven grounds is addressed herein.

## DISCUSSION

I.   **Applicable Legal Standards**

   A.   **AEDPA Generally**

Section 2254(d) provides, in relevant part, that a court may grant a writ of habeas corpus on a claim that has been previously adjudicated on the merits by a state court only if the state-court adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

A state court decision is "contrary to" clearly established federal law where the state court either applies a rule that "contradicts the governing law" set forth in Supreme Court precedent or "confronts a set of facts that are materially indistinguishable from a [Supreme Court] decision," and arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" of clearly established federal law pursuant to this provision occurs when the state court identifies the correct governing legal principle, but unreasonably applies that principle to "a set of facts different from those of the case in which the principle was announced." *Lockyer v. Andrade*, 538 U.S. 63, 73-76 (2003).

A claim is considered "adjudicated on the merits" when it is decided based on the substance of the claim advanced, rather than on a procedural ground. *See Sellan v. Kuhlman*, 261

F.3d 303, 311 (2d Cir. 2001). "When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits[.]" *Johnson v. Williams*, 568 U.S. 289, 301 (2013). However, if the state court rejects a claim based on a state procedural rule that constitutes an adequate and independent ground for the decision, it may not be reviewed by a federal habeas court. *See Wilkerson v. N.Y. State Bd. of Parole*, No. 13-CV-03817 (GHW), 2015 WL 678581, at *9 (S.D.N.Y. Feb. 17, 2015); *see also Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003).

Moreover, under AEDPA, federal courts reviewing habeas petitions must give substantial deference to state court decisions. "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). In addition, federal habeas courts must presume that the state courts' factual findings are correct unless a petitioner rebuts that presumption with "clear and convincing evidence."[6] *Id.* at 473-74 (quoting 28 U.S.C. § 2254(e)(1)).

**B.  Exhaustion Requirement And Procedural Bar To Claims Deemed Exhausted In 28 U.S.C. § 2254 Proceedings**

"[B]efore a federal court can consider a habeas application brought by a state prisoner, the habeas applicant must exhaust all of his state remedies." *Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011) (citing 28 U.S.C. § 2254(b)(1)(A)). This is to provide the state courts the

---

[6] "A state court decision is based on a clearly erroneous factual determination if the state court failed to weigh all of the relevant evidence before making its factual findings." *Lewis v. Conn. Comm'r of Corr.*, 790 F.3d 109, 121 (2d Cir. 2015) (internal quotation marks omitted).

"'opportunity to pass upon and correct' alleged violations of . . . prisoners' federal rights." *Picard*

*v. Connor*, 404 U.S. 270, 275 (1971).

The exhaustion requirement has two components. *Parrish v. Lee*, No. 10-CV-08708 (KMK),

2015 WL 7302762, at *6 (S.D.N.Y. Nov. 18, 2015). First, a court considers whether the petitioner

"'fairly presented to an appropriate state court the same federal constitutional claim that he now

urges upon the federal courts.'" *Id*. (quoting *Klein v. Harris*, 667 F.2d 274, 282 (2d Cir. 1981)). A

petitioner may satisfy the fair presentation requirement by:

> (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, [or] (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*Carvajal*, 633 F.3d at 104 (quoting *Daye v. Attorney Gen. of N.Y.*, 696 F.2d 186, 194 (2d Cir. 1982)).

In *Baldwin v. Reese*, 541 U.S. 27 (2004), the Supreme Court held that "ordinarily a state prisoner

does not 'fairly present' a claim to a state court if that court must read beyond a petition or a

brief (or a similar document) that does not alert it to the presence of a federal claim[.]" *Id*. at 32.

"'Second, having presented [the] federal constitutional claim to an appropriate state

court, and having been denied relief, the petitioner must have utilized all available mechanisms

to secure [state] appellate review of the denial of that claim.'" *Parrish*, 2015 WL 7302762, at *7

(quoting *Klein*, 667 F.2d at 282). In connection with this requirement, "the Supreme Court has

held that when a 'petitioner failed to exhaust state remedies and the court to which the

petitioner would be required to present his claims in order to meet the exhaustion requirement

would now find the claims procedurally barred,' federal habeas courts also must deem the claim

procedurally defaulted." *Sweet v. Bennett*, 353 F.3d 135, 139 (2d Cir. 2003) (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)).

"In New York, . . . a criminal defendant must first appeal his or her conviction to the Appellate Division, and then must seek further review of that conviction by applying to the Court of Appeals for a certificate granting leave to appeal." *Galdamez v. Keane*, 394 F.3d 68, 74 (2d Cir. 2005). "New York procedural rules bar its state courts from hearing either claims that could have been raised on direct appeal but were not, or claims that were initially raised on appeal but were not presented to the Court of Appeals." *Sparks v. Burge*, No. 06-CV-06965 (KMK) (PED), 2012 WL 4479250, at *4 (S.D.N.Y. Sept. 28, 2012); *see also DiGuglielmo v. Smith*, 366 F.3d 130, 135 (2d Cir. 2004) (affirming the "denial of [a] habeas petition on the grounds, *inter alia*, that [petitioner's] claims were not properly exhausted" where "they were not properly presented to New York's highest court").

"When a petitioner can no longer present his unexhausted claim of trial error to the state courts," a federal court sitting in habeas review "deem[s] the claim procedurally barred." *Richardson v. Superintendent of Mid-Orange Corr. Facility*, 621 F.3d 196, 201 (2d Cir. 2010) (internal quotation marks citation omitted). The merits of a procedurally defaulted claim may not be reviewed by a federal court "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[ ] will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750; *see also Murray v. Carrier*, 477 U.S. 478, 495-96 (1986).[7]

---

[7] The "cause" prong of the cause-and-prejudice test ordinarily requires a showing that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray*, 477 U.S. at 488. The "prejudice" prong requires that the defendant suffer "actual prejudice

### C. **Claims Cognizable On Habeas Review**

When a petitioner on habeas review challenges evidentiary rulings made by the state court(s) below, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991); *see* 28 U.S.C. § 2254(a). To prevail on a claim that evidentiary error resulted in a constitutional deprivation of due process, a petitioner must establish "the error was so pervasive as to have denied him a fundamentally fair trial." *Collins v. Scully*, 755 F.2d 16, 18 (2d Cir. 1985). In so doing, a petitioner "bears a heavy burden because evidentiary errors generally do not rise to constitutional magnitude." *Copes v. Schriver*, No. 97-CV-2284 (JGK), 1997 WL 659096, at *3 (S.D.N.Y. Oct. 22, 1997) (citation omitted).[8]

### D. **Ineffective Assistance Of Counsel**

"A defendant in criminal proceedings has a right under the Sixth Amendment to effective assistance from his attorney at all critical stages in the proceedings[.]" *Guerrero v. United States*, No. 07-CR-0248 (GHW), 2017 WL 1435743, at *6 (S.D.N.Y. Apr. 20, 2017) (quoting *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013)). To establish a constitutional violation of ineffective assistance of counsel, a petitioner must show that: (1) counsel's performance "fell

---

resulting from the errors of which he complains." *United States v. Frady*, 456 U.S. 152, 168 (1982) (internal quotation marks and citation omitted). The petitioner must show that the errors at trial created an "actual and substantial disadvantage, infecting [the] entire trial with error of constitutional dimensions." *Rosario-Dominguez v. United States*, 353 F. Supp. 2d 500, 508 (S.D.N.Y. 2005) (quoting *Frady*, 456 U.S. at 170).

[8] *See also Crane v. Kentucky*, 476 U.S. 683, 689 (1986) (acknowledging a "traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts"); *DiGuglielmo*, 366 F.3d at 136 (alleged errors of state law "cannot be repackaged as federal errors simply by citing the Due Process Clause") (internal quotations marks and citation omitted); *Ponnapula v. Spitzer*, 297 F.3d 172, 182 (2d Cir. 2002) ("not every error of state law can be transmogrified by artful augmentation into a constitutional violation") (internal quotation marks and citation omitted).

below an objective standard of reasonableness[,]" and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). "The *Strickland* standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001); *see also United States v. Gaskin*, 364 F.3d 438, 468 (2d Cir. 2004) ("A defendant seeking to overturn a conviction on the ground of ineffective assistance of counsel bears a heavy burden.").[9]

In evaluating whether counsel's performance was ineffective, appellate counsel is subject to the same standard as trial counsel. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000) ("[T]he proper standard for evaluating Robbins' claim that appellate counsel was ineffective in neglecting to file a merits brief is that enunciated in *Strickland v. Washington*."). In the context of AEDPA, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). Given that the "standards

---

[9] Under the first *Strickland* prong, there is a "strong presumption" that a lawyer's conduct "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Therefore, a petitioner "must overcome the presumption that, under the circumstances, the challenged action, might be considered sound trial strategy." *Id.* (internal quotation marks omitted). "In considering whether counsel failed to exercise the skills and diligence that a reasonably competent attorney would provide under similar circumstances, the Court looks to the totality of the record and must make 'every effort . . . to eliminate the distorting effects of hindsight.'" *Guerrero*, 2017 WL 1435743, at *6 (quoting *Strickland*, 466 U.S. at 688-89; *Boria v. Keane*, 99 F.3d 492, 496 (2d Cir. 1996)). Under the second *Strickland* prong, the petitioner must demonstrate that the ineffective assistance prejudiced the defense, which means showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is defined as a probability sufficient to undermine confidence in the outcome, including the overall integrity of the proceeding." *Guerrero*, 2017 WL 1435743, at *6 (internal quotation marks omitted).

created by *Strickland* and § 2254(d) are both highly deferential, . . . when the two apply in tandem, review is doubly so." *Id.* at 105 (internal quotation marks and citations omitted).

### E.  **Statute Of Limitations**

AEDPA contains a one-year statute of limitations for claims raised in a habeas petition. 28 U.S.C. § 2244(d)(1). Pursuant to AEDPA, the one-year limitation period runs

> from the latest of—(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review; (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action; (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1). The one-year statute of limitations also applies to any amendments Petitioner makes to his Petition, unless the new claims in the amendment relate back to the original petition. *See* Fed. R. Civ. P. 15(c) ("An amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading"); *see also Fama v. Comm'r of Corr. Servs.'*, 235 F.3d 804, 815 (2d Cir. 2000).

### F.  **Motion To Amend**

Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that "[t]he court should freely give leave [to amend] when justice so requires." However, leave to amend may be denied when there is a sound basis for doing so, such as undue delay, bad faith, dilatory motive, undue prejudice to the opposing party, or futility. *See Foman v. Davis*, 371 U.S. 178, 182 (1962). In this regard, "[w]hen the claims that a petitioner seeks to add to a habeas petition are untimely under

the one-year statute of limitations provided by [AEDPA], the amendment is futile, and leave to amend should be denied." *Sookoo v. Heath*, No. 09-CV-09820 (JGK), 2011 WL 6188729, at *3 (S.D.N.Y. Dec. 12, 2011) (citations omitted).

**G.  Issuance Of Stay**

The Court in a habeas case "ha[s] authority to issue stays where such a stay would be a proper exercise of discretion." *Rhines v. Weber*, 544 U.S. 269, 276 (2005) (internal citation omitted). This discretion is limited to circumstances where the Court is presented with a "mixed" petition seeking habeas corpus relief, *i.e.*, a "petition containing some claims that have been exhausted in the state courts and some that have not." *Id.* at 271; *see also Harden v. LaClaire*, No. 07-CV-04592 (LTS) (JCF), 2008 WL 4735231, at *2 (S.D.N.Y. Oct. 27, 2008) ("district courts have discretion to stay habeas petitions containing both exhausted and unexhausted claims."). A stay is not warranted when a petition does not include unexhausted claims. *See Fernandez v. Ercole*, No. 14-CV-02974 (RA)(HBP), 2017 WL 2364371, at *6 (S.D.N.Y. May 31, 2017).

Even when a petitioner requests to stay a mixed petition to pursue unexhausted claims in state court, the petitioner must demonstrate good cause for failing to previously exhaust the claims. *Rhines*, 544 U.S. at 277; *see also Martinez v. Mariuscello*, No. 16-CV-7933 (RJS), 2017 WL 2735576, at *2-3 (S.D.N.Y. June 23, 2017) (finding petitioner failed to meet good cause standard when he "provide[ed] no reason at all for his failure to exhaust his claims . . . ."). The Supreme Court has found that a district court abuses its discretion when it grants a stay for a petitioner to pursue unexhausted claims which are plainly meritless.[10] *Rhines*, 544 U.S. at 277. Unexhausted

---

[10] This is because "[s]taying a federal habeas petition frustrates AEDPA's objective of encouraging finality by allowing a petitioner to delay the resolution of the federal proceedings." *Rhines*, 544 U.S. at 277.

claims are meritless, for example, when they are time-barred and do not "relate back" to claims asserted in the original petition. *Martinez*, 2017 WL 2735576, at *2-3.

### H.  Liberal Construction Of *Pro Se* Petition

It is a petitioner's burden to establish, by a preponderance of the evidence, that a violation of constitutional rights has occurred. *See Cardoza v. Rock*, 731 F.3d 169, 178 (2d Cir. 2013). However, the submissions of a *pro se* petitioner are held to less stringent standards than formal pleadings drafted by lawyers. *See Davis v. Walsh*, No. 08-CV-4659 (PKC), 2015 WL 1809048, at *1 n.1 (E.D.N.Y. Apr. 21, 2015) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)). Where a petitioner is *pro se*, the court must liberally construe his petition and interpret it "to raise the strongest arguments that [it] suggest[s]." *Green v. United States*, 260 F.3d 78, 83 (2d Cir. 2001).

## II.   Application

### A.  The Trial Court's Admission Of Testimony Regarding A Crime That Occurred Earlier Does Not Provide a Basis for Habeas Relief (Ground One)

As a first ground in his habeas petition, Petitioner asserts that his right to a fair trial was violated when the trial court admitted testimony regarding an unrelated crime committed years earlier. (Pet. at 4.) The State argues that this ground was not exhausted, is procedurally barred and is meritless. (State Opp. Mem., ECF No. 19, at 37-41, 45-48.)

The claim is unexhausted, and thus it is procedurally barred, and Petitioner does not show cause and prejudice to overcome the procedural bar. Although Petitioner did raise this issue on direct appeal to the First Department, he did not frame this issue as implicating the U.S. Constitution or federal law in any way, nor did the First Department consider it as a violation of Petitioner's federal constitutional rights. Petitioner argued on direct appeal that the trial court

improperly "allowed the prosecution to elicit facts concerning a July 2004 shooting involving Inoa and several of Contreras' workers, as a 'warning for Contreras,' for which Inoa was never charged." (Direct Appeal Brief for Def.-Appellant at 44.) In support of this point, he exclusively relied on state court precedent (*id.* at 43-45) which did not employ constitutional analysis. Because Gutierrez did not fairly present this claim as a federal claim to the state court below, *see Baldwin*, 541 U.S. at 32 (a petitioner "does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim . . . ."), the claim is not exhausted.[11]

Because the claim is unexhausted, it is procedurally barred, and Petitioner cannot overcome the procedural bar. In the Petition, he does not demonstrate (nor does he attempt to) cause for his failure to exhaust his claim, nor actual prejudice. And, given the overwhelming evidence of Petitioner's guilt, *see* Order on Direct Appeal at 22-24, he cannot demonstrate actual innocence to overcome the procedural bar.

Even if Petitioner's first ground was not procedurally barred, it is not cognizable on habeas review. This claim is rooted in evidentiary rulings made by the state court concerning the admissibility of certain testimony. Such an evidentiary claim ordinarily does not rise to the level

---

[11] As another reason why Ground One, as well as Grounds Two and Four are unexhausted, Respondent argues that Petitioner did not present those grounds for appellate review in any form to the New York Court of Appeals, the highest state court. (*See* State. Opp. Mem. at 38-39.) However, because Petitioner stated in his application seeking leave from the Court of Appeals that he was seeking leave to appeal "so I can exhaust all available state remedies on my appeal issues," and given Petitioner's *pro se* status, I decline to find that the claims are not exhausted on this basis. *See Morgan v. Bennett*, 204 F.3d 360 (2d Cir. 2000) (letter asking Court of Appeals to consider all issues raised in the Appellate Division was sufficient to exhaust all claims); *see also Harris v. Fischer*, 438 F. App'x 11, 13 (2d Cir. 2011) (summary order) (where letter stated that petitioner wished to press all issues raised below, claims considered exhausted). Respondent asserts that Ground Three is also not exhausted, albeit for different reasoning, which the Court addresses *infra* § II.C.

of a constitutional violation. *Copes*, 1997 WL 659096, at *3. And, due to the overwhelming evidence presented at trial against Petitioner, it cannot be said that he was denied a fundamentally fair trial. Thus, the claim presented in Ground One does not rise to the level of a constitutional deprivation of due process, and it is not cognizable on habeas review.

Finally, even reviewing the claim on the merits, the Court finds that the state court's determination was reasonable. Under New York law, evidence of other crimes may be presented when such evidence can "logically be linked to some specific material issue in the case." *People v. Hudy*, 73 N.Y.2d 40, 54 (1988), *abrogated on other grounds by Carmell v. Texas*, 529 U.S. 513 (2000). The July 2004 shooting incident involved Inoa and Contreras, Inoa's later victim. Therefore, testimony regarding that incident was relevant to Inoa's prosecution for the murder of Contreras, and it was not unreasonable for the state court to admit the testimony, nor was it unreasonable for the First Department to deny the claim on the merits. In any event, even if the trial committed error in permitting such testimony at trial, such error was harmless considering the overwhelming evidence of Petitioner's guilt.

**B.  The Trial Court's Admission Of Testimony From Duran, Regarding Her Interpretation Of Petitioner's Recorded Conversations, Does Not Provide A Basis For Habeas Relief (Ground Two)**

Next, Petitioner argues that the trial court improperly admitted testimony from Duran, a nonexpert witness, regarding her interpretation of Petitioner's recorded conversations. (Pet. at 5-6.) As with the first ground for relief, Respondent argues that this ground was not exhausted, is procedurally barred and is meritless. (State Opp. Mem. at 37-41, 48-56.)

As in initial matter, this claim is properly exhausted. On direct appeal, Petitioner argued the admission of Duran's testimony resulted in "a conviction based on hearsay evidence," which

violated his "constitutional right of confrontation." (Direct Appeal Brief for Def.-Appellant at 51.) In support of his argument, Petitioner cited to *Crawford v. Washington*, 541 U.S. 36 (2004), a seminal case on Confrontation Clause jurisprudence. Thus, Petitioner fairly presented the claim as a federal constitutional claim on direct appeal. The First Department provided a summary of Duran's testimony and stated that the testimony "was powerfully confirmed" by other evidence in the record, and denied the claim on the merits. (Order on Direct Appeal at 25.) And, as stated previously, *see supra* note 11, the Court finds that Petitioner presented this claim to the Court of Appeals, which denied leave to appeal. The claim thus is exhausted.

Evaluating the claim on the merits, the state court did not act unreasonably in admitting Duran's testimony. Under the Confrontation Clause, a criminal defendant must be allowed to confront witnesses against him. U.S. Const. amends. VI, XIV; *Crawford*, 541 U.S. at 36. The Confrontation Clause does not bar admission of "an unavailable witness's out-of-court statement" if the statement falls "within a 'firmly rooted hearsay exception'" or bears "'particularized guarantees of trustworthiness,'" *Crawford*, 541 U.S. at 42 (quoting *Ohio v. Roberts*, 448 U.S. 56, 66 (1980)), although the Confrontation Clause does bar the admission of any "testimonial" extrajudicial statement from a non-testifying witness.[12] *Id.* at 51. The Court in *Crawford* clarified that, "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." *Id.* at 59, n.9.

---

[12] A testimonial statement is a "solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.*

Here, Duran's testimony was informed by her firsthand knowledge of the conspiracy to kill Contreras, not hearsay statements made by others. Even if her testimony could be interpreted as resting on out-of-court hearsay statements made by her coconspirators, those conversations did not constitute the kinds of solemn, testimonial statements precluded by the Confrontation Clause. *Id.* at 51; *see also People v. Inoa*, 109 A.D.3d 765, 766 (1st Dep't. 2013) (finding any confrontation argument with respect to Duran's testimony meritless, because testimony "did not introduce any testimonial statements made by nontestifying declarants"). Further, under New York law, a "declaration by a coconspirator during the course and in furtherance of the conspiracy is admissible against another coconspirator as an exception to the hearsay rule." *People v. Caban*, 5. N.Y.3d 143, 148 (2005) (internal quotation marks and citation omitted). And, "any act or declaration of the accused inconsistent with innocence is admissible." *Prince, Richardson on Evidence* S 8-204 (citing *People v. Casey*, 95 N.Y. 2d 354, 362 (2000)).

Because Duran's knowledge of the conspiracy came firsthand from statements made by the coconspirators as part of the conspiracy, and because any hearsay statements admitted were admissible under hearsay exceptions, the state court decisions to permit the admission of Duran's testimony were not unreasonable.

## C.   The Trial Court's Admission of Testimony Regarding Multiple Conspiracies That Were Not Part Of The Charged Offense Does Not Provide A Basis For Habeas Relief (Ground Three)

As a third ground for habeas relief, Petitioner argues that the trial court improperly admitted testimony regarding multiple conspiracies that were not part of the charged offense. (Pet. at 7.) As with Petitioner's first two grounds for relief, the State argues that this ground was not exhausted, is procedurally barred and is meritless. (State Opp. Mem. at 37-45.)

Because Petitioner did not fairly present this claim as a federal claim to the state court below, it is not exhausted, and therefore it is procedurally barred. It is true that Petitioner raised this issue on appeal to the First Department. (Direct Appeal Brief for Def.-Appellant at 57-58.) And, in his appeal brief, Petitioner relied upon two Second Circuit cases for discussion of evidence regarding multiple conspiracies: (1) *United States v. Cambindo Valencia*, 609 F.2d 603 (2d Cir. 1979), and (2) *United States v. Bertolotti*, 529 F.2d 149 (2d Cir. 1975). (*Id.*) However, Petitioner's argument on direct appeal – that he was prejudiced by the admission of certain testimony – is not a constitutional argument, and it cannot be said that Petitioner's citations to *Cambindo Valencia* and *Bertolotti* were sufficient to fairly present any constitutional claim to the First Department. *See Baldwin*, 541 U.S. at 32 (a petitioner "does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim . . . ."). *Bertolotti* does not analyze constitutional principles at all, and although *Cambindo Valencia* mentions the Double Jeopardy Clause of the Constitution throughout (*see, e.g.*, *Cambindo Valencia*, 609 F.2d at 637), Petitioner's claim of prejudice is not based on the Double Jeopardy Clause. Thus, it cannot be said with regard to the third ground that a constitutional issue was fairly presented to the state court, and the claim therefore is not exhausted.[13]

---

[13] To the extent Petitioner attempted to raise this claim as a federal claim to the Court of Appeals, the claim is unexhausted. (*See* Application Seeking Leave, Response Ex. G. at 3-5 (discussing First Department's error on claim involving multiple conspiracies).) In support of his claim in his leave application, Petitioner does not raise a constitutional principle, nor does he cite any state or federal cases which employ constitutional analysis. (*Id.* at 4-5.) Further, even construing Petitioner's leave application as presenting a federal claim to the Court of Appeals, "New York procedural rules bar its state courts from hearing [] claims that could have been raised on direct appeal but were not[.]" *Sparks*, 2012 WL 4479250, at *4.

As a result, the claim is procedurally barred, and Petitioner cannot overcome the procedural bar. In the Petition, he does not demonstrate (nor does he attempt to demonstrate) cause for his failure to exhaust his claim, or actual prejudice. And, given the overwhelming evidence of Petitioner's guilt, he cannot demonstrate actual innocence.

Even if the court could examine the claim on the merits, the claim is not cognizable on habeas review. Petitioner alleges he was prejudiced by the trial court's admission of evidence about conspiracies other than the one to kill Contreras. Like Ground One, this claim is rooted in evidentiary rulings made by the state court concerning the admission of certain testimony; evidentiary rulings ordinarily do not rise to the level of a constitutional violation. *Copes*, 1997 WL 659096, at *3. To sufficiently allege a violation of his constitutional rights based on a state evidentiary ruling, Petitioner would have to show that he was deprived of a fundamentally fair trial. *Collins*, 755 F.2d at 18. Due to the overwhelming evidence presented at trial against Petitioner, he cannot make such a showing.

Nevertheless, even reviewing the claim on the merits, the state courts below acted reasonably. The trial court's admission of the evidence of other conspiracies was not unreasonable, given that, as detailed in the First Department's well-reasoned decision that: the trial court properly received evidence regarding the conspiracy, that "[t]here was no need for a multiple conspiracies charge, because the evidence clearly established a single conspiracy" and that "[i]t was clear from the court's charge that the People were required to prove a murder conspiracy, and the jury could not have been misled to believe that a drug conspiracy would serve as a basis for conviction." (Order on Direct Appeal at 23.) Thus, the claim does not provide a basis for habeas relief.

**D.** **The Trial Court's Admission Of Testimony Of Detective Rivera As A Quasi-Expert On Narcotics Trafficking Does Not Provide A Basis For Habeas Relief (Ground Four)**

As a fourth ground for habeas relief, Petitioner argues the trial court improperly permitted Detective Rivera to testify as a quasi-expert on narcotics trafficking. (Pet. at 8.) Again, Respondent argues that this ground was not exhausted, is procedurally barred and is meritless. (State Opp. Mem. at 37-41, 48-56.)

This claim is exhausted. Petitioner brought this claim on direct appeal to the First Department, and specifically pointed out that one of the Second Circuit cases to which he cited in support of this claim found that admission of certain expert testimony violated the defendant's rights under the Confrontation Clause.[14] (Direct Appeal Brief for Def.-Appellant at 58-64.) This was sufficient to alert the First Department of the alleged constitutional violation. And, as stated previously, *see supra* note 11, Petitioner exhausted this claim when he raised it in his application seeking leave to apply to the Court of Appeals.

On the merits, Petitioner cannot prevail on his claim. The Court of Appeals held in the appeal from Inoa's conviction that much of Detective Rivera's testimony was admitted in error, but that such error was harmless. *Inoa*, 25 N.Y.3d at 473-75. Similarly here, on Petitioner's appeal, the First Department held that the admission of Rivera's testimony was harmless, stating:

> Although the Court of Appeals determined in [*Inoa*], that considerable portions of Detective Rivera's testimony as an expert in decoding phone conversations were admitted in error, here, as in *Inoa*, the proof of defendant's commission of the charged crimes was overwhelming and we perceive no significant probability that,

---

[14] Further, this portion of Petitioner's brief on direct appeal cited to two Second Circuit cases: (1) *United States v. Mejia*, 549 F .3d 179 (2d Cir. 2008), and (2) *United States v. Dukagjini*, 326 F.3d 45 (2d Cir. 2003).

but for the error, the verdict would have been less adverse (*see People v. Crimmins*,[15] 36 N.Y.2d 230, 367 N.Y.S.2d 213, 326 N.E.2d 787 [1975]).

(Order on Direct Appeal at 23-24.) Thus, state courts below acted reasonably, and habeas relief on this ground is not warranted.

E.   **Petitioner Is Not Entitled To Habeas Relief Based Upon Ineffective Assistance Of Appellate Counsel (Ground Five)**

As a fifth ground for habeas relief, Petitioner argues he was denied his right to effective assistance of counsel on appeal. (Pet. at 9.) Petitioner asserts that his appellate counsel "was ineffective when he failed to raise significant and obvious appealable issues thus waiving those issues precluding review by State and federal courts."[16] (*Id.*) Specifically, the two issues that Petitioner argues were not raised by appellate counsel were that: (1) "removing a juror and then placing the dismissed juror back on the jury panel after speaking to the prosecutor and investigator over objection . . . violated [Petitioner's] fair trial rights"; and (2) the trial court's "expanded [jury] charge[]" deprived Petitioner of a fair trial. (*See id*.)

This claim is properly exhausted. Petitioner first raised the claim in state court in his *coram nobis* petition. (*Id*. ¶ 11; Notice of Mot., Response Ex. J.) The First Department denied the Petition on the merits on October 25, 2016. (Order, Response Ex. M.) The claim was exhausted when Petitioner sought leave to appeal the First Department's Order from the Court of Appeals (Pet.'s Appl. Seeking Leave, Response Ex. N), which was denied. (Order Denying Leave, Response Ex. P.)

On the merits, the first issue raised by Petitioner is factually incorrect. It is not true that a dismissed juror was placed back on the jury panel. Rather, the trial transcript reflects that, during

---

[15] *Crimmins* is a seminal case addressing the harmless error doctrine in New York.

[16] Petitioner asserts that this "denied him meaningful representation and a fair appeal proceeding[.]" (*Id.*)

jury deliberations, one of the jurors expressed in a note to the Court that she could "no longer be fair to the defendants, nor the prosecution." (TR.[17] at 3118-21.) Both sides thereafter consented to dismissing the juror and replacing her with an alternate, which was done. (*Id*. at 3121-22.) The dismissed juror was not put back on the jury after she was dismissed on consent, nor was there any other basis for appellate counsel to challenge the juror's dismissal. Thus, under the first prong of *Strickland*,[18] it cannot be said that Petitioner's appellate counsel was ineffective for failing to raise this issue.

The second issue – relating to a purportedly "expanded" jury charge – relates to a note received by the trial court from the jury asking whether the "law specifies a time frame for formation of intent," and whether "intent can be formed in a split second." (TR. at 3125.) The trial court prepared an "expanded" intent charge, showed the charge to both counsel, and then provided it to the jury. (*Id*. at 3125-29.) Neither counsel objected to the charge, and the Petition does not articulate how the expanded charge was in error. Further, the Court has compared the expanded charge that was provided to the jury (TR. at 3128-29) with the model Expanded Charge on Intent provided by the New York Unified Court System's Committee on Criminal Jury Instructions and Model Colloquies (http://www.nycourts.gov/judges/cji/1-General/CJI2d.Intent.pdf), and finds the language to be substantially the same.[19] Thus, there is

---

[17] The trial transcript ("TR.") is filed in this action at ECF Nos. 24-44. Citations to pages of the trial transcript refer to the pagination that runs throughout the transcript.

[18] 466 U.S. at 689.

[19] Indeed, it appears that the trial judge may have been reading from the model charge when he addressed the jury.

no basis to argue that appellate counsel was ineffective for failing to raise this issue on appeal. *See Strickland*, 466 U.S. at 689.

Based upon the record before the Court, the Court finds no basis to overcome the "strong presumption" that the conduct of Petitioner's appellate counsel fell "within the wide range of reasonable professional assistance." *Id.* As a result, the Court finds that Petitioner's appellate counsel did not act unreasonably, and state court's denial of Petitioner's claim of ineffective assistance of counsel was not unreasonable. *See Harrington*, 562 U.S. at 101 (under AEDPA analysis, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable.") Therefore, Ground Five does not provide a basis for habeas relief.

**F.   Petitioner Should Not Be Granted Leave to Amend His Petition to Pursue His Two Additional Claims That Have Not Been Exhausted, And No Stay Should Be Granted**

Petitioner seeks to amend his Petition to add two claims that, by his own admission, have not been exhausted: (1) his Sixth Amendment right to a public trial was violated when the trial court ejected his family members from the courtroom; and (2) his trial counsel denied him the right to be present at material stages of his case.[20] (2/20/18 Letter at 2-5.) The two unexhausted claims were not raised by Gutierrez on direct appeal, in his *coram nobis* petition or in this proceeding, but he now moves to amend his Petition to add them to this proceeding. Respondent argues that Petitioner's motion to amend is untimely since it was not filed by the court-imposed deadline of April 15, 2018, but was filed more than three weeks later. (Opp. Aff., ECF No. 17, ¶

---

[20] I may have the authority to rule on Petitioner's motion to amend by way of a separate Opinion and Order, rather than by this Report and Recommendation. *See, e.g.*, *Kilcullen v. N.Y. State Dept. of Transp.*, 55 F. App'x 583, 584-85 (2d Cir. 2003) (referring to motion to amend as a non-dispositive matter that may be referred to a magistrate judge for decision pursuant to 28 U.S.C. § 636(b)(1)(A)). I nevertheless am making a recommendation to the District Court out of an abundance of caution since a ruling on the motion to amend is dispositive of the two additional claims that Petitioner seeks to assert in this action.

7.) However, given Petitioner's status as a *pro se* inmate, I deem the motion to amend to be timely filed.

Before Petitioner first sought to raise the two unexhausted claims, the one-year statute of limitations period in which to timely raise them expired. On January 7, 2016, the Court of Appeals denied Gutierrez leave to appeal from the First Department's affirmance of his judgment (*see* Order Denying Leave, Response Ex. I); therefore, his judgment became final ninety days later, on April 6, 2016. *See McKinney v. Artuz*, 326 F.3d 87, 96 (2d Cir. 2003). Thereafter, Petitioner had one year to file a habeas petition, not including any time excluded for a properly-filed collateral challenge to the conviction in state court. See 28 U.S.C. § 2244(d)(1), (d)(2). This one-year period had expired by the time that Petitioner sought to assert the unexhausted claims, in the 2/20/18 Letter. Because the claims are time-barred, it would be futile for Petitioner to raise them now, and such futility serves a basis for denying the amendment. *Sookoo*, 2011 WL 6188729, at *3.

To escape AEDPA's statute of limitations, Petitioner seeks to invoke the doctrine of equitable tolling. He argues he could not previously have discovered the factual predicate of his proposed new claims through the exercise of due diligence.[21] (5/9/18 Letter, ECF No. 16, at 2.) To support this argument, Petitioner notes that he has been kept in administrative segregation since December 31, 2010 for 23 hours per day; that he has a first-grade reading level; the he has a lack of reading comprehension; that he has "trouble with writing English," and that these things "prevented him from discovering the factual predicate of the proposed new claim[s] through the exercise of due diligence." (*Id*.)

---

[21] Notably, Petitioner does not argue that his two unexhausted claims relate back to the time of the filing of the initial Petition, even though, as Petitioner admits, he was invited to do so. (Pet. 5/9/18 Ltr. at 1.)

The Court finds these arguments to be unavailing, and they do not excuse his failure to raise these claims earlier. Petitioner thus has failed to demonstrate "that he has been pursuing his rights diligently, and that some extraordinary circumstance stood in his way and prevented timely filing," as required for him to be entitled to equitable tolling.[22] *McQuiggin v. Perkins*, 569 U.S. 383, 391 (2013) (quoting *Holland v. Florida*, 560 U.S. 631, 649 (2010)).

Even notwithstanding the fact that these two claims which Petitioner now seeks to assert are time-barred, neither claim raises a violation of any constitutional right. With respect to the first claim, even if Petitioner's family members were excluded from the courtroom (which is in dispute), the Court does not find that the absence of his family members had any impact on the trial itself, nor resulted in a violation of any constitutional right.[23] With respect to the second claim, Petitioner is not entitled under the Constitution to be present during every hearing in his criminal case. The Due Process Clause protects a defendant's right to be present for

---

[22] Petitioner's first claim is based upon his family members being ejected from the courtroom. (2/20/18 Letter at 2-4.) Respondent denies that "the courtroom was closed to anyone." (5/24/18 Opp. Aff., ECF No. 17, ¶ 14; *see also* 3/1/18 Opp. Aff., ECF No. 14, ¶ 15 ("[W]hile the transcript of petitioner's trial does not reflect a court officer refusing Ledwing [Gutierrez (Petitioner's cousin)] admission to the courtroom, it appears to provide some insight into petitioner's proposed claim.").) The Court finds that Petitioner should or could have been aware that there was an issue with his family members being present in court, since the transcript of his trial reflects that the State might move to exclude Gutierrez's mother on the ground that she was intimidating witnesses. (*See* TR. at 213-14.) Also, there was nothing stopping Petitioner from obtaining an affidavit from one of his family members within the AEDPA one-year limitations period regarding this claim. Petitioner's second claim is that his trial counsel denied him the right to be present at material stages of his case. (2/20/18 Letter at 4.) The only specific hearing that Petitioner asserts he did not attend was a hearing on his motion to set aside the verdict. (*Id*.) Petitioner provides no factual basis for the proposition that he was unaware of the hearing until after the AEDPA one-year limitations period expired.

[23] The Court finds unavailing Petitioner's claim that the preclusion of his family members from the courtroom denied him of "His Sixth Amendment Right To A Public Trial." (2/20/18 Letter at 2.) The Court is not persuaded that Petitioner's rights under the Sixth Amendment were violated, as Petitioner's trial was still open to the public.

nontestimonial portions of trial where his presence bears "a relation, reasonably substantial, to his opportunity to defend against the charge." *Snyder v. Commonwealth of Mass.*, 291 U.S. 97, 105-06 (1934), *overruled in part on other grounds by Malloy v. Hogan*, 378 U.S. 1 (1964). The Supreme Court has held that "the right to be present during all critical stages of the proceedings and the right to be represented by counsel . . . as with most constitutional rights, are subject to harmless error analysis, unless the deprivation, by its very nature, cannot be harmless." *Rushen v. Spain*, 464 U.S. 114, n.2 (1983) (internal citations omitted). The Second Circuit, analyzing this and other relevant Supreme Court precedent, has distinguished between "trial errors," which are subject to harmless error review, and "structural errors," which undermine the fundamental integrity of the trial process and are subject to automatic reversal. *Yarborough v. Keane*, 101 F.3d 894, 896-97 (2d Cir. 1996) (citing, *inter alia*, *Arizona v. Fulminante*, 499 U.S. 279 (1991)). Specifically applying this framework to an absence from trial, the Court looked at "not only at the right violated, but also at the particular nature, context, and significance of the violation," and concluded that the "absence of the defendant from a peripheral proceeding of secondary importance is subject to harmless error review." *Id.* at 897-98. In the present case, given the overwhelming evidence of Petitioner's guilt, Petitioner's absence at the hearing on the motion to set aside the verdict was harmless.

Since the two unexhausted claims that Petitioner seeks to add are time-barred, and meritless, Petitioner has not demonstrated that a stay is warranted. *See Rhines*, 544 U.S. at 277 (finding a court abuses its discretion when granting a stay for a petitioner to pursue unexhausted claims which are meritless). Thus, I recommend that the motion to amend and for a stay be denied.

## **CONCLUSION**

For the foregoing reasons, the Court recommends that the motions to amend and for a stay be DENIED, and that the Petition for Writ of Habeas Corpus be DENIED in its entirety. Further, I recommend that the Court decline to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A), because Petitioner has not "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Clerk of Court is directed to mail a copy of this Report and Recommendation to the *pro se* Petitioner, along with a copy of the Report and Recommendation of Judge Cott in *Inoa v. Smith*, 16-CV-2708 (VEC) (JLC), ECF No. 40.

DATED:      New York, New York
            April 17, 2019

_____
STEWART D. AARON
United States Magistrate Judge

\*               \*               \*

### **NOTICE OF PROCEDURE FOR FILING OBJECTIONS**
### **TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections, and any response to objections, shall be filed with the

Clerk of the Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Gardephe.

**THE FAILURE TO FILE THESE TIMELY OBJECTIONS WILL RESULT IN A WAIVER OF THOSE OBJECTIONS FOR PURPOSES OF APPEAL.** *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); *Thomas v. Arn,* 474 U.S. 140 (1985).